**The MORNING TELEGRAPH, a Division of Triangle Publications, Inc.,**
Plaintiff-Appellee,

v.

**Bertram A. POWERS, individually and as President, et al., Defendants-Appellants.**

**Nos. 1043–1045, Dockets 71–1494 to 71–1496.**

United States Court of Appeals, Second Circuit.

Argued June 10, 1971.

Decided Oct. 13, 1971.

As Amended on Denial of Rehearing Nov. 5, 1971.

John J. Sheehan, New York City, for defendants-appellants.

Aaron M. Fine, Philadelphia, Pa., Royall, Koegel & Wells, New York City (Richard N. Winfield, New York City, of counsel), for plaintiff-appellee.

Before HAYS, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

The parties to this appeal have come down the now-familiar path which winds between state and federal labor law, with management trying to bypass the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 107, and the union sidestepping the doctrine of Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962), and Local 174, Teamsters, etc., v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), that Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), does not deprive the state courts of jurisdiction, even though the state court may be enforcing rights created by federal law. The quarrel here is whether, with Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 132, 8 L.Ed.2d 440 (1962), overruled and out of management's way, Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), permitting a strike to be enjoined when the labor-management contract contains a no-strike and a binding arbitration clause, presents an impassable roadblock to the union.

■ On March 1, 1971, the Morning Telegraph obtained an *ex parte* temporary restraining order from the Supreme Court of the State of New York, enjoining the defendant New York Typographical Union No. 6 ("Union") from engaging in a work slowdown in the composing room of the Morning Telegraph, at its offices in New York City. The restraint was to continue in effect until a hearing scheduled for March 3, 1971, but was extended automatically by 28 U.S.C. § 1450 [1] when removed by the Union to the federal district court under 28 U.S.C. § 1441 and Avco Corp. v. Aero Lodge 735, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), permitting removal to federal court of a § 301 suit initially brought in state court.

1. 28 U.S.C. § 1450 provides:

Whenever any action is removed from a State court to a district court of the United States * * *
* * * * *

[a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court.

Judge Bonsal of the Southern District of New York heard the Union's first motion to vacate the temporary restraining order on March 9, 1971. By order dated March 23, 1971, he denied the Union's motion on the authority of Boys Markets, Inc. v. Retail Clerks Union Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), finding that the collective bargaining agreement between the parties contained a no-work-stoppage clause and a corresponding provision for the settlement of grievances through arbitration. Judge Bonsal granted the union leave to renew the motion to dissolve if and when it saw fit to state the nature of the grievance which precipitated the work slowdown. Rather than take up Judge Bonsal on his invitation to specify the grievance, however, the Union renewed its motion to dissolve the restraining order, arguing, this time before Judge Metzner, that no hearing on preliminary injunctive relief had been held within the ten-day limit prescribed by Rule 65(b), Fed.R.Civ.P., and that the temporary restraining order therefore had necessarily expired. Judge Metzner ruled that the hearing on March 9, 1971, had satisfied the requirements of Rule 65(b), and that Judge Bonsal's order of March 23, 1971, was in effect a renewed grant of preliminary injunctive relief with no ten-day limitation.

The Union subsequently appealed both the order of Judge Bonsal and that of Judge Metzner, and filed a third motion to vacate the restraining order, which was heard by Judge Motley on April 27, 1971. Judge Motley found the district court without jurisdiction while the two appeals were pending, and denied the Union's motion from the bench. The Union then appealed Judge Motley's ruling. The three appeals have been consolidated here.

At the outset, we must decide whether we have jurisdiction under 28 U.S.C. § 1292 to review the orders of Judges Bonsal, Metzner and Motley. We start, of course, from the premise that an appeal will lie from the grant or denial of a preliminary injunction but not from the grant or denial of a temporary restraining order. Grant v. United States, 282 F.2d 165 (2d Cir. 1960). The difficulty arises in characterizing a given order.

Neither Judge Bonsal nor Judge Metzner characterized his order as a preliminary injunction, but "in applying this distinction [between a temporary restraining order and a preliminary injunction] the label put on the order by the trial court is not decisive." Wright, Federal Courts 459 (2d ed. 1970), quoted with approval in Belknap v. Leary, 427 F.2d 496, 498 (2d Cir. 1970). Here, the practical effect of the refusal to dissolve the temporary restraining order was the equivalent of a grant of preliminary injunctive relief. Peabody Coal Co. v. Barnes, 308 F.Supp. 902 (E.D.Mo.1969).

The primary distinguishing characteristics of a temporary restraining order, under the Federal Rules, are its availability as an *ex parte* remedy, and its propensity to self-destruct after twenty days, at the outside. A preliminary injunction, on the other hand, has no such time limit, as it is by force of law granted only after both sides have been heard. The Union was heard on the propriety of preliminary relief in this case not once but three different times. And Judge Metzner specifically stated that he was eliminating any time limit from the restraint. We will therefore treat Judge Metzner's order as a preliminary injunction. Judge Motley's order thus stands as a refusal to dissolve an injunction and is likewise appealable under 28 U.S.C. § 1292(a), but as we hold that Judge Metzner's order was appealable, the question is moot in a sense, for Judge Motley was correct that she had no jurisdiction to consider an order which had already been appealed. O'Brien v. Avco Corp., 309 F.Supp. 703, 705 (S.D.N.Y.), rev'd on other grounds, 425 F.2d 1030 (2d Cir. 1969).

The Union's initial refusal to state its grievance, and its subsequent oblique

references to employee representation in the Morning Telegraph's Hightstown, New Jersey, plant, have made the record in this case something less than illuminating, and the disposition, at either the trial or appellate level, something less than facile.

The affidavit of Bertram Powers, president of the Union, not filed until after Judges Bonsal and Metzner had issued their rulings, states that "the dispute arose out of the issue of representation of plaintiff's *production* employees employed at its Hightstown, New Jersey plant" (original emphasis), and that the Union had been granted jurisdiction over "production work" at Hightstown by the Executive Council of the ITU. But we are nowhere told the difference, if any, between production work and other composing room work, or whether "production work" is composing room work at all. Elsewhere in the record it appears that Triangle Publications publishes, or plans to publish in the near future, the Daily Racing Form, the Eastern Edition of which will apparently be printed in Hightstown, New Jersey. We are not told whether Triangle Publications does any work on the Morning Telegraph in Hightstown now, or if and when it plans to in the future. Nor are we told anything about the employees who now work in Hightstown and are apparently represented by the Trenton Typographical Union. We do not know, for instance, whether they are production workers, and we have no indication whether they work on the Morning Telegraph or the Daily Racing Form. We are left, then, with little else than the contract itself.

The Union's contract with Triangle Publications is written in the form of an agreement supplemental to an earlier contract between the same Union and the Publishers Association of New York City, an organization representing the Long Island Press Company, the New York News, the New York Post Corporation and the New York Times Company. The earlier agreement (hereinafter the "underlying contract") was to be in effect for three years, from March 31, 1970, to March 30, 1973. The portion of the underlying contract dealing with strikes and work stoppages is the following:

### JOINT COMMITMENT

4. It is the intention and the desire of the parties hereto that no strike or other interruption of normal employment or production shall occur during the life of this agreement. To this end the Union and the Publishers commit themselves to the orderly settlement of disputes as provided herein. However, New York Typographical Union No. 6 reserves to itself the right to direct its members to support a strike of this Union or of New York Mailers' Union No. 6, I.T.U., against any Publisher or Publishers signatory hereto which strike has been authorized under the laws of the I.T.U. Should such support or should unauthorized work stoppages by members of Typographical Union No. 6 result in substantial curtailment of composing room operations, the Publisher or Publishers thereby affected reserve the right to be relieved of the prohibition against the use of substitute processes or operations as provided in the jurisdictional section hereof during the period in which such support is granted or such substantial curtailment of operations continues. Upon resumption of normal operations, use of substitute processes or operations shall be discontinued. The Union agrees that it will not support a strike or work stoppage under any other circumstances.

Procedures are also established for the arbitration of "grievances." [2]

2. GRIEVANCE COMMITTEE
85 Any controversy (except as provided otherwise herein) arising under this contract between a signatory Publisher and the Union shall be submitted to the President of the Union or his representatives, and the Publisher, or his representatives, for conciliation.

The Supplemental Agreement, executed by the Union and the Morning Telegraph on July 31, 1970, effective March 31, contains the following material modifications of the underlying agreement:

The parties hereto shall be bound by and shall adhere to the terms and conditions in the collective bargaining agreement entered into between the Party of the Second Part and The Long Island Daily Press Publishing Company, Inc., The New York News, Inc., The New York Times Company and the New York Post Corporation, through their agent, The Publishers' Association of New York City, covering the period March 31, 1970 to March 30, 1973, *with the following exceptions:*

Discharges shall be processed in accordance with Section 86 (Appeal from Discharge)[3] of the contract referred to above, except that the procedures shall apply as between the Union and the particular employer.

It is mutually agreed by the parties hereto that The Morning Telegraph shall be bound by decisions which involve controversies arising out of the above-mentioned contract, and determined by the principal parties to that contract through the methods and agencies provided in Section 85 (Grievance Committee) therein.

However, *should there arise any controversy, as between the parties to this agreement,* which has not been previously determined by the Long Island Daily Press Publishing Company, Inc., The New York News, Inc., The New York Times Company and The

Pending final settlement, conditions prevailing prior to the dispute shall be maintained.

If conciliation fails, then the dispute shall be referred to a board composed of two representatives of the Union and two representatives of the Publishers. This board shall meet within five days from the date a dispute was referred to it and shall endeavor to settle the dispute, provided, that at the request of either party, this board shall meet only for the purpose of selecting a fifth and impartial member, who is to act as chairman. If the board is unable to agree on the fifth member, he shall be designated according to the rules of the American Arbitration Association.

As thus constituted, the five-man board shall meet within ten days from the date the dispute was referred to it and shall proceed promptly to settle the controversy.

The decision of the majority of this board shall be final and binding; provided, any decision on any issue shall not be retroactive to a date earlier than the date on which the issue is raised; provided, further, this board shall have jurisdiction only over controversies properly and specifically referred to it, and its decisions cannot abridge the fundamental rights reserved by and to the signatory Publisher and the Union.

It is agreed that local Union Laws not affecting wages, hours or working conditions and the General Laws of the International Typographical Union at the time of the signing of the contract, shall not be subject to arbitration.

Nothing herein obligates either party to arbitrate differences respecting a succeeding contract.

3. APPEAL FROM DISCHARGE

86 When an employee is discharged for any of the reasons set forth in Section 5 of this Contract and such action is contested by such employee or in his behalf by any party to this Contract, the contention shall be referred directly to the board set up under Section 85 of this agreement and processed as provided for the settlement of disputes, except that the sentence "Pending final settlement, conditions prevailing prior to the dispute shall be maintained" shall not apply in discharge cases.

The majority of the board, in rendering a decision, shall take into consideration all the facts and conditions surrounding the discharge.

Where discharges are made for reasons other than stated in Section 5 (Employment, Discharge, Priority) and the aggrieved employee appeals, on his motion the procedure shall be in accordance with the I.T.U. Law in force at date of signing Contract. An appeal from discharge must be filed by the employee or by the Union with the Publishers' Association within 30 days of the date of discharge.

New York Post Corporation, through their agent, The Publishers' Association of New York City and New York Typographical Union No. 6, an appeal may be made to the Executive Council of the International Typographical Union. [Emphasis added.]

■ The present dispute involving a work slowdown in the Morning Telegraph composing room in New York is clearly not arbitrable under the terms of the contract. We agree with the Union's contention that had the parties intended Section 85 (Grievance Committee) of the underlying agreement to govern such a dispute between them, they might have easily so provided, as they did with Section 86 (Discharges),[4] instead of establishing a different procedure for "any controversy * * * between the parties to this agreement. * * *"

The Morning Telegraph argues that it has been willing, at all times, to submit a valid dispute to arbitration, but that the Union's initial failure to specify the nature of the grievance made arbitration impossible. The Company also argues that if the Union is disgruntled over representation in the Telegraph's Hightstown, New Jersey, plant, its appeal must be to the National Labor Relations Board, as the dispute is entirely outside this contract. The Telegraph points out that it has an existing contract with the Trenton Typographers Union at its Hightstown plant, and that the claimed decision of the Executive Council of the ITU can be of no moment to the Telegraph, which had no notice of or chance to be heard on that appeal.

Indeed, the Morning Telegraph has great difficulty believing that it could have signed a contract with a provision for the resolution of contract disputes only by (optional) appeal to the Executive Council of the ITU. But there the provision is—"any controversy" between the Morning Telegraph and the Union not previously determined by The Publishers' Association and New York Typographical Union No. 6 is resolved by appeal to the Executive Council of the ITU.

■ With the perhaps superfluous observation that the supplemental contract appears to hold the Union bound to "industry arbitration" only, we find it unnecessary to decide precisely which disputes might or might not be subject to compulsory arbitration under this contract, as the instant dispute apparently is not, whether it is undefined, or defined as "jurisdictional" or "representational."

It is true that in Carey v. Westinghouse Electric Corp., 375 U.S. 261, 84 S. Ct. 401, 11 L.Ed.2d 320 (1964), the Supreme Court, through Mr. Justice Douglas, held that a "jurisdictional" or work assignment dispute, short of a strike, as well as a "representational" dispute, may be an arbitrable grievance under a labor contract. Carey in effect defined an area of overlapping jurisdiction between the Board and the arbitrator, filling a statutory gap to avoid "forcing [a work assignment] controversy into the strike stage before a remedy before the Board is available." 375 U.S. at 264, 84 S.Ct. at 405.[5]

4. The Union buttresses this argument with reference to a management suggestion, during negotiations, that Section 85 be included in the contract. The suggestion was not adopted.

5. Once a union has struck over a work assignment dispute, of course, an unfair labor practice has occurred, 29 U.S.C. § 158(b) (4) (D), and the Board itself may seek temporary injunctive relief in a federal district court, 29 U.S.C. § 160(k). If the dispute is representational, on the other hand, resort to the "therapy of arbitration," 375 U.S. at 272, 84 S.Ct. 401, in the first instance may obviate the need for an appeal to the Board, although the Board, if appealed to, would have the final say. While it is possible that management may at the least be liable in damages for bargaining with the wrong union, even if done in good faith reliance on the arbitrator's award, Carey v. Westinghouse Corp., 375 U.S. at 275, 84 S.Ct. 401 (dissenting opinion), an available remedy would appear to be a petition for clarification of the bargaining unit under § 9(c) of the Act. 29 U.S.C. § 159(c).

But while *Carey* may be the starting gate, when the controversy is labeled as "jurisdictional" or "representational," it is not the finish line for this case, for *Carey* dealt with a contract containing a much broader arbitration clause than that here.

Moreover, although neither party to this dispute has mentioned Section 3 (Jurisdiction) of the underlying contract, that clause would seem on its face to remove a work assignment dispute from the grievance arbitration procedure the contract provides. Section 3 says that

It is agreed that this contract determines the agreement of the parties covering the jurisdiction over work processes specified herein. Any dispute concerning such jurisdiction shall not be subject to arbitration.

The conditions prevailing prior to the incident, action or proposed change resulting in any difference between the parties as to any jurisdictional question shall be maintained until the dispute is resolved as herein provided.

Any controversy over jurisdiction shall be resolved by discussion between the parties. If such discussion fails to resolve the issue appeal may be made to the Executive Council of the International Typographical Union. In the event either party is unwilling or unable to resolve the controversy in the manner herein above specified, then either party may refer it for recommendation only to the Joint Supervisory Commission provided for in Section 6 hereof.

Nothing in the supplemental agreement overrides Section 3 of the underlying contract. If, then, the dispute were over work assignments, it clearly would not be subject to arbitration under this contract.

The orders of Judges Bonsal and Metzner are reversed, the injunctive relief vacated, and the cause remanded. Judge Motley's order is affirmed.